STEPHEN E. DONAHUE (SD-5100)
M. GRAHAM LOOMIS (not admitted in SDNY)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Atlanta District Office
3475 Lenox Road, N.E., Suite 500
Atlanta, Georgia 30326-1232
(404) 842-7600

JASON R. GETTINGER (JG-5895)
Local Counsel for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Suite 4300
New York, N.Y. 10281-1022
212-336-0575

05 CV 8016



RECEIVED
SEP 15 2005
U.S.D.C. S.D. N.Y.
CASHIERS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| -against- | CIVIL ACTION NO. |
| JAMES J. FARLEY and SHELLEY J. FARLEY, | |
| Defendants. | |

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against James J. Farley ("J. Farley") and Shelley J. Farley ("S. Farley"), (collectively "the Farleys"), alleges as follows:

## OVERVIEW

1.  This matter involves insider trading in the securities of CryoLife, Inc. ("CryoLife"), a company that preserves and sells implantable human tissue.

2.  On August 14, 2002, J. Farley, an employee of CryoLife Inc. ("CryoLife"), and S. Farley, his spouse, traded on the basis of material, non-public information concerning CryoLife's nationwide quality assurance shipping hold ("QA Hold").

3.  CryoLife imposed the QA Hold in response to receiving an Order for Retention, Recall, and/or Destruction ("Recall Order") issued by the Food and Drug Administration ("FDA") on August 13, 2002.

4.  The Recall Order required CryoLife to stop distributing any human tissue that CryoLife had processed between October 3, 2001 and August 13, 2002, and to recall any such tissue previously distributed.

5.  The Farleys sold CryoLife stock, and tipped two family members, after learning of the QA Hold, but before the public learned of the QA Hold or Recall Order.

6.  When CryoLife publicly disclosed the QA Hold and Recall Order, the price for its common stock plummeted until the New York Stock Exchange ("NYSE") halted trading. At that point, CryoLife's stock was trading at $5.50 per share, down 42% from the prior day's closing share price of $9.50.

7.  Through their conduct, the Farleys avoided losses, and caused their tippees to avoid losses, totaling approximately $56,832.

2

8. By their conduct, the Farleys have engaged in, and unless restrained and enjoined by this Court, will continue to engage in acts and practices which constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## JURISDICTION AND VENUE

9. This Court has jurisdiction of this action under Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. 77t(b), 77t(d) and 77v], and Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. 78u(d), 78u(e), 78u-1 and 78aa].

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2); Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]; and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the actions set forth herein that constitute violations of the Securities Act and the Exchange Act occurred within the Southern District of New York.

## THE DEFENDANTS

11. J. Farley resides in Medford, New Jersey. During the relevant time, J. Farley was a salesman in CryoLife's Northeast Region.

12. S. Farley resides in Medford, New Jersey. During the relevant time, S. Farley was married to defendant J. Farley.

## THE COMPANY

13. CryoLife is a Florida corporation headquartered in Kennesaw, Georgia. The company claims to be a leader in the development, preservation and commercialization of

3

implantable living human tissues for use in cardiovascular, vascular and orthopaedic surgeries throughout the United States and Canada. Additionally, CryoLife develops and commercializes implantable medical devices.

14. CryoLife's stock is registered pursuant to Section 12(b) of the Exchange Act. During the relevant period, CryoLife's stock was listed on the NYSE and PUT and CALL options on CryoLife's stock were traded on the Chicago Board Options Exchange.

### THE RECALL ORDER

15. On or about November 7, 2001, a 23-year old Minnesota man died after receiving infected tissue during reconstructive knee surgery. The tissue had come from a donor and had been processed by CryoLife on or after October 3, 2001.

16. In response, in December 2001, the FDA and the Centers for Disease Control and Prevention ("CDC") began a joint investigation into CryoLife's practices. In January 2002, both agencies notified CryoLife that its inspections had concluded that the death in November 2001 was related to an infection from tissue processed by CryoLife. The CDC subsequently issued remedial recommendations to CryoLife.

17. During March and April 2002, after becoming aware of other patients becoming infected by CryoLife's products, the FDA conducted a second investigation of CryoLife. The FDA concluded that CryoLife's handling of certain tissue received and distributed by it might have been in violation of federal regulations.

18. On or around June 17, 2002, unsatisfied by CryoLife's responses to both of its investigations, the FDA issued a Warning Letter to CryoLife. The Warning Letter cautioned that,

if CryoLife did not "*take prompt action to correct these deviations,*" the FDA could "*take additional . . . action without . . . notice, including, but not limited to, seizure, injunction, civil penalties, and/or an Order for Retention Recall and/or Destruction.*"

19. On or around June 24, 2002, CryoLife disclosed the Warning Letter to the public. The first two days after the Warning Letter was disclosed, CryoLife's stock price dropped from $23.84 to $15.30 per share, a 36% decline.

20. On Tuesday, August 13, 2002, after the stock market closed, the FDA informed CryoLife that the FDA had issued the Recall Order covering the majority of CryoLife's tissue products. The Recall Order directed CryoLife to cease distributing human tissue that CryoLife had processed between October 3, 2001 and August 13, 2002, and recall any such tissue previously distributed, because CryoLife could not ensure that such tissue was free from contamination.

21. Later during the evening of August 13, 2002, as a result of the Recall Order, CryoLife's senior management instructed CryoLife's shipping and customer service departments to place a hold on all outbound tissue shipments and to recall recently shipped tissue products, including those already delivered to customers.

22. CryoLife had never before instituted a nationwide QA Hold.

## THE LIMITED DISCLOSURE OF THE QA HOLD

23. Although CryoLife's senior management told the company's customer service manager about the Recall Order, they decided to withhold news of the Recall Order from virtually all other CryoLife employees, and the public, until August 14, 2002.

24. Following senior management's instruction, the customer service manager told CryoLife's customer service and shipping departments that CryoLife had instituted its own nationwide QA Hold, and during the evening of August 13, 2002, directed those employees to place a hold on all outbound tissue shipments and to begin recalling recently shipped tissue products that were either in transit or had already arrived at their destination.

25. The customer service representatives were further specifically told not to disclose to customers the reason behind what they were doing, *i.e.*, the QA Hold, and not to contact any of CryoLife's sales representatives, who were not to be told of the Company's shipping halt or recall efforts.

26. Although the two customer service representatives initially followed their instructions, they quickly grasped that the QA Hold was unprecedented for CryoLife and decided that they needed to inform those CryoLife sales representatives whose customers they were calling of both the QA Hold and the Company's efforts to halt, or obtain the return of, shipments.

27. When contacting the sales representatives, these customer service representatives never suggested that every CryoLife customer, including those not affected by the QA Hold, should be contacted.

## THE FARLEYS LEARN ABOUT THE QA HOLD

28.     The following morning as new customer service personnel reported for work, CryoLife senior management provided more information to the customer service personnel, telling them that the shipping halt had been imposed by the FDA, and allowing them to communicate that information to CryoLife sales representatives in the field.

29.     Accordingly, a CryoLife customer service representative contacted J. Farley in the morning of August 14, 2002, and told him that the FDA had imposed a shipping halt. The customer service representative further explained that, while she did not want J. Farley to call all of his customers, she did want him to tell any customers who were expecting a shipment, or who might call to place an order, that no shipments would be made because the FDA had imposed a shipping halt.

30.     Shortly after hearing from the CryoLife customer service representative, J. Farley told his wife, S. Farley, about the situation.

## THE MARKET RESPONDS NEGATIVELY TO THE RECALL ORDER

31.     On August 14, 2002, at approximately 12:07 p.m. ET, wire services began to carry stories about the Recall Order.

32.     During the next twenty minutes, the share price of CryoLife's stock dropped from $9.20 to $5.50.

33.     At 12:30 p.m. ET, the NYSE halted trading in CryoLife stock. At that time, the stock was down $4.00 per share, a 42% decrease from the prior day's close of $9.50 per share. The last trade in CryoLife stock on August 14, 2002 was at $5.50 per share.

34.     After the trading halt, CryoLife issued a press release that disclosed the Recall Order. The press release also disclosed that CryoLife had placed all related tissue in quarantine (i.e., a QA Hold), was withdrawing its financial guidance for the rest of 2002, and was evaluating the situation to determine its expected impact on CryoLife's business and operations.

35.     During the afternoon of August 15, 2002, CryoLife stock reopened for trading at $1.50 per share. After trading as low as $1.40 per share, the stock closed at $2.03 per share, a drop of $3.47 per share (63%) from the closing price on August 14, 2002 and of $7.47 per share (79%) from the August 13, 2002 closing price.

### THE FARLEYS TRADE CRYOLIFE SECURITIES AND TIP TWO FAMILY MEMBERS BEFORE THE MARKET RESPONDS TO THE RECALL ORDER

36.     Before the public learned of the Recall Order or QA Hold, the Farleys sold approximately 7,711 shares of CryoLife stock at prices ranging from approximately $9.30 to $9.45 per share.

37.     When J. Farley initially placed an order to sell some of these shares, he became dissatisfied with the commission that his broker intended to charge for executing the transaction, and asked how long it would take to transfer his shares to another broker-dealer. When J. Farley was told that such a transfer might take a "couple of days," he changed his mind and said: "I'm not happy with the fee but there is nothing I can do about it. Just dump it."

38.     J. Farley also asked his broker if there were any other CryoLife shares in any other accounts which had not been sold, including his wife's IRA account. The broker responded that, although his wife was holding 1,845 shares of CryoLife, J. Farley was not authorized to conduct trades in his wife's IRA account and that the broker would only accept a sell order from his wife.

39. Shortly thereafter, J. Farley again called his brokerage firm in an attempt to sell the CryoLife stock held in his wife's IRA. Although another broker answered the phone, this broker also told J. Farley that he was not an authorized trader in his wife's account.

40. J. Farley told the broker that he was unable to reach his wife, but that he would have his wife call him back. Ten minutes later, S. Farley called the broker and instructed him to sell all of her CryoLife shares from her IRA account at the market price.

41. Combined, the Farleys' sale of CryoLife shares generated gross proceeds of approximately $72,485, and allowed them to avoid losses of approximately $56,832.

42. Before the public learned of the Recall Order or QA Hold, J. Farley also tipped his sister-in-law and her husband about the QA Hold and/or the shipping halt imposed by the FDA.

43. As a result, the sister-in-law and her husband sold 365 shares of CryoLife stock before the public knew about the Recall Order or QA Hold, avoiding losses of approximately $2,693.

44. By providing these family members with material, non-public information, J. Farley is responsible for their $2,693 losses avoided.

## COUNT I

### Violations of Section 17(a) of the Securities Act [15 U.S.C. 77q(a)]

45. Paragraphs 1 through 44 are hereby realleged and are incorporated herein by reference.

46. During 2002, the Farleys, singly or in concert, in connection with the offer or sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails,

    (a) directly and indirectly employed devices, schemes and artifices to defraud purchasers of such securities;

    (b) directly and indirectly obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, not misleading; and/or

    (c) engaged in transactions, practices and a course of business which would have operated as a fraud or deceit upon the purchasers of such securities,

all as more particularly described above.

47. The Farleys knowingly, intentionally and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud. In engaging in such devices, schemes and artifices to defraud, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard of the fact that (a) their trading activity was based upon material non-public information, and (b) in trading they were (i) breaching a fiduciary relationship or other relationship of trust or confidence, or (ii) had received the information from someone breaching such a duty.

48. By reason of the foregoing, the Farleys, directly and indirectly, have violated, are violating and, unless restrained and enjoined, will continue to violate §17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II

## Violations of Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]

49.     Paragraphs 1 through 44 are hereby realleged and are incorporated herein by reference.

50.     The Farleys, during 2002, singly or in concert, in connection with the purchase and sale of securities, directly and indirectly, by the use of means and instrumentalities of interstate commerce and by use of the mails:

    (a)     employed devices, schemes, and artifices to defraud;

    (b)     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    (c)     engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon persons, in connection with the purchase and sale of such securities,

all as more particularly described above.

51.     The Farleys knowingly, intentionally and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard of the fact that (a) their trading activity was based upon material non-public information, and (b) in trading they were (i) breaching

a fiduciary relationship or other relationship of trust or confidence, or (ii) had received the information from someone breaching such a duty.

52. By reason of the foregoing, the Farleys have violated, and unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission, respectfully prays that the Court:

I.

Issue a permanent injunction enjoining defendants J. Farley, and S. Farley, and their agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of the order by personal service or otherwise, and each of them, from violating:

   (a)   Section 17(a) of the Securities Act [15 U.S.C. 77q(a)]; and

   (b)   Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

II.

Issue an Order requiring defendants James J. Farley, and Shelley J. Farley to disgorge all losses avoided in connection with sales of CryoLife stock they made, or caused others to make, while they were in possession of material, nonpublic information as alleged in the Commission's Complaint, plus pay prejudgment interest thereon.

III.

Issue an Order pursuant to Section 21A of the Exchange Act [15 U.S.C. 78u-1] imposing a civil monetary penalty against defendants James J. Farley, and Shelley J. Farley.

IV.

Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

V.

Grant such other and further relief as may be necessary and appropriate.

This 14 day of September 2005,

RESPECTFULLY SUBMITTED,

_____
STEPHEN E. DONAHUE (SD-5100)
M. GRAHAM LOOMIS (not admitted to SDNY)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Atlanta District Office
3475 Lenox Road, N.E., Suite 500
Atlanta, Georgia 30326-1232
(404) 842-7600
(404) 842-7679 (fax)

JASON R. GETTINGER (JG-5895)
Local Counsel for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Suite 4300
New York, New York 10281-1022
212-336-0575
212-336-1323 (fax)

13